HENRY E. KEPPEL, JR., ET AL. *v.*
BARoss BUILDERS, INC.
(3564)

HULL, DALY and BIELUCH, Js.

Argued April 2—decision released May 20, 1986

*Steven J. Errante,* for the appellant (defendant).
*David J. Peska,* for the appellees (plaintiffs).

HULL, J. The defendant, BaRoss Builders, Inc., appeals from the judgment which a state trial referee, exercising the powers of the Superior Court, rendered in favor of the plaintiffs, Henry E. Keppel, Jr., and Marilyn L. Keppel, on their suit against the defendant based on claimed deficiencies in its construction of a residence for them. The plaintiffs' amended complaint was in four counts: breach of contract; failure to complete work contracted for, and completion of some of the work in an unworkmanlike manner; negligent performance of services; and breach of implied warranties under General Statutes § 47-118. The defendant filed three special defenses essentially claiming that it tried to make some of the repairs and complete certain work, but that it was refused entry into the plaintiffs' house to do so. The court found for the plaintiffs on the first, second and fourth counts. It awarded $28,000 to raise the house as required to remedy one of the deficiencies, $3393 for miscellaneous repairs, and $11,890 in interest, for a total judgment of $43,283. We find no error.

The defendant claims two errors: (1) that the trial court incorrectly measured the amount of damages, and improperly awarded interest at 8 percent per year from the return date, November 20, 1979, to the date of judgment; and (2) that the state trial referee, *Hon. Philip R. Pastore,* improperly declined to disqualify himself from hearing the case even though he had previously heard the plaintiffs' demand and the defendant's offer, and had previously stated that the defendant's president was playing fast and loose with the court.

The trial court found the following facts. Under a sales agreement dated October 6, 1978, the defendant, owner of a parcel of land, agreed to build a house on the lot for the plaintiffs according to certain specifications. The total cost was to be $123,800. The height of the basement should have been seven feet eight inches, as reflected in the building permit the defendant obtained, but instead it varied from six feet eight to six feet nine inches. The greater height was required by the building code if the basement was to be used as a living space. The defendant had reason to know that the plaintiffs intended to so use it. The specifications called for a walk-out glass sliding door and other construction features were consistent with such a use of the basement. The plaintiffs did not become aware of the deficiency in the height of the basement until after taking title. To make the basement height seven feet eight inches would require either the lowering of the basement floor, or the raising of the house. There was expert testimony disapproving the lowering of the floor for reasons including water and construction conditions, and recommending instead the raising of the house to obtain the requisite basement height.

The defendant first claims that the trial court erred in awarding $28,000 for raising the house rather than adopting the cheaper remedy of lowering the floor. By so doing, it is in essence asking us to retry the facts. This we cannot do. *Jones* v. *Litchfield,* 1 Conn. App. 40, 42, 467 A.2d 936 (1983), cert. denied, 192 Conn. 802, 470 A.2d 1218 (1984).

The defendant next claims that because its expert testified that $1500 to $2000 represented the reasonable cost of lowering the floor, the court's award of $28,000 to raise the house constituted unreasonable economic waste. " 'As a general rule, in awarding damages upon a breach of contract, the prevailing party is entitled to compensation which will place him in the

same position he would have been in had the contract been properly performed. *Bertozzi* v. *McCarthy,* 164 Conn. 463, 468, 323 A.2d 553 [1973]; *Sabo* v. *Strolis,* 148 Conn. 504, 506, 172 A.2d 609 [1961]. Such damages are measured as of the date of the breach. *Bachman* v. *Fortuna,* 145 Conn. 191, 194, 141 A.2d 477 [1958]; *Lee* v. *Harris,* 85 Conn. 212, 214, 82 A. 186 [1912]; 22 Am. Jur. 2d, Damages § 52. For a breach of a construction contract involving defective or unfinished construction, damages are measured by computing either "(i) the reasonable cost of construction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste; or (ii) the difference between the value that the product contracted for would have had and the value of the performance that has been received by the plaintiff, if construction and completion in accordance with the contract would involve unreasonable economic waste." Restatement, 1 Contracts § 346 (1) (a), p. 573; see annot., 76 A.L.R.2d 805, 812 § 4.' *Levesque* v. *D & M Builders, Inc.,* 170 Conn. 177, 180–81, 365 A.2d 1216 (1976)." *Barnicoat* v. *Edwards,* 1 Conn. App. 652, 654–55, 474 A.2d 808 (1984).

The trial court, in its memorandum of decision, made clear that it was using the reasonable cost of construction and completion in accordance with the contract as the measure of damages. It made no finding, however, as to whether completion of the contract would involve unreasonable economic waste. The defendant did not seek, pursuant to Practice Book § 3082, to have the court articulate its decision in this regard. It is the appellant's burden to furnish us with an adequate appellate record on which to review the basis of the decision of the trial court. Since the defendant failed to meet this burden, we have no basis on which to find error. *Pointina Beach Assn., Inc.* v. *Stella,* 1 Conn. App. 341, 343, 471 A.2d 970 (1984).

The defendant also claims error in the trial court's allowance of interest as an element of damages. This determination is primarily an equitable one. It was, additionally, a matter lying within the discretion of the trial court. *Bertozzi* v. *McCarthy*, 164 Conn. 463, 467, 323 A.2d 553 (1973). The defendant does not claim that the court could not award interest on equitable considerations or that its doing so was an abuse of discretion. Rather, it claims that the amount of interest awarded was inequitable because the award of damages for raising the house was improperly measured. This claim of error falls along with the claim on which it depends.

The defendant's final claim of error is based on the state trial referee's refusal to disqualify himself after hearing the plaintiffs' demand and the defendant's offer, and after stating that the defendant's president was playing fast and loose with the court. During a hearing on January 15, 1984, counsel for the plaintiffs read into the record that the defendant would transfer to the plaintiffs an attached lot in full satisfaction of the plaintiffs' claims. Three conditions were attached to this agreement. On May 24, 1984, the plaintiffs reported to the court that two of the three conditions had been met and that the defendant would not go along with the "stipulation." The defendant claimed that the first two conditions were not resolved by March 1, and accordingly, the proposed agreement became inoperative on that date pursuant to a clause in the agreement. At this point, defense counsel also stated that Thomas L. BaRoss, the defendant's president, was psychologically incapable of testifying. After further colloquy between counsel, the trial court stated: "Now, I must say that the impression that I get with reference to Mr. BaRoss is that he's been playing fast and loose with his attorney and with the court. I expected Mr. BaRoss to be here this

morning." The court further stated: "I might say at that time this critical status of the period of March 1 that has been projected this morning did not appear to be in the air. Which is one of the situations, together with everything that happened in the past, to make me believe that Mr. BaRoss is playing fast and loose in this case. . . ."

The court then denied the plaintiffs' request that it order the property transferred, finding that the agreement did not amount to a definite stipulation. Counsel for the plaintiffs objected to the ruling and stated that there was an agreement, and that there was no testimony that the plaintiffs had to adhere to a March 1 date in removing the conditions which were part of the claimed agreement. At this point, counsel for the defendant requested that the referee disqualify himself based on the statements that had been made about BaRoss playing fast and loose with the court. The referee noted the defendant's motion but refused to disqualify himself. Later that day, counsel for the defendant reiterated his demand that the referee disqualify himself, claiming that not only did the parties discuss settlement in terms of a particular piece of property, but they also discussed the possible value of that piece of property.

"The standard to be employed [in evaluating a motion for recusal] is an objective one, not the judge's subjective view as to whether he or she can be fair and impartial in hearing the case. In Connecticut, the disqualification of judges is governed by General Statutes § 51-39[1] and Canon 3 (C) of the Code of Judicial Conduct. Under Canon 3 (C) (1) of the Code of Judicial Conduct '[a] judge should disqualify himself [or herself] in a proceeding in which his [or her] impartiality might

---

[1] General Statutes § 51-39 (a) concerns disqualification by relationship or interest and is not involved here.

*reasonably* be questioned . . . . ' (Emphasis added.) 'Any conduct that would lead a reasonable [person] knowing all the circumstances to the conclusion that the judge's "impartiality might reasonably be questioned" is a basis for the judge's disqualification. Thus, an impropriety or the appearance of impropriety . . . that would reasonably lead one to question the judge's impartiality in a given proceeding clearly falls within the scope of the general standard . . . .' Thode, Reporter's Notes to Code of Judicial Conduct (1973), pp. 60–61. 'The question is not whether the judge is impartial in fact. It is simply whether another, not knowing whether or not the judge is actually impartial, might reasonably question his [or her] impartiality, on the basis of all of the circumstances.' *Rice* v. *McKenzie,* 581 F.2d 1114, 1116 (4th Cir. 1978); see *Spires* v. *Hearst Corporation,* 420 F. Sup. 304, 307 (D. Cal. 1976)." *Papa* v. *New Haven Federation of Teachers,* 186 Conn. 725, 744–46, 444 A.2d 196 (1982).

We consider first the referee's refusal to recuse himself on the basis of the proposed settlement read into the record. The defendant relies on the strong language in *Krattenstein* v. *G. Fox & Co.,* 155 Conn. 609, 236 A.2d 466 (1967), that "when a jury are ultimately to determine the issues of liability and damages, a question is not likely to arise as to the disqualification of the judge who conducted the pretrial hearing and who thereafter presides over the trial of the case. When, however, a judge engages in a chambers conference looking to the settlement of a case which he is about to try as a court and in which he will be called upon to decide the issues of liability and damages, quite a different situation prevails. It is then impossible to avoid questions as to whether the judge can disregard, on the trial, matters disclosed in the conference but unmentioned during the trial and whether a preliminary judgment, formed at the conference and predi-

cated on unsubstantiated claims of proof, may have some subtle influence on a final judgment after a full hearing. It is inevitable that the basis is laid for suspicion, no matter how unfounded or unjustified it may be, and that failure to concur in what the judge may consider an adequate settlement may result in the imposition, upon a litigant or his counsel, of some retributive sanction or the incurrence of judicial displeasure.

"For a judge in chambers to solicit or receive the opinion of counsel as to the dollar value of a court case which he is to hear; to express not only his opinion as to that dollar value but, after that opinion has been conveyed to a party, to persist in his efforts at settlement by requesting counsel again to convey it to his client; and, on further refusal of the litigant to accede to the judge's proposal, to hear the case and render judgment is a procedure which inevitably raises in the minds of litigants, as well as counsel, as it did in this instance, a suspicion as to the fairness of the court's administration of justice. It is a procedure which is inconsistent with the proper exercise of the judicial function and one which we do not approve." Id., 614–15.

*Krattenstein* does not, however, support the defendant's position for two reasons. First and foremost, the defendant makes no claim that the trial court discussed the proposed settlement in chambers or that he was an advocate for a particular settlement of the case. It is this element of the judge's involvement in and commitment to the proposed settlement that distinguishes *Krattenstein*. A similar situation was present in *State* v. *Watson*, 198 Conn. 598, 611, 504 A.2d 497 (1986), where the defendant claimed error in the trial court's failure to recuse itself from hearing his motion to withdraw his guilty pleas. The defendant alleged that he had been coerced into pleading guilty because of the collusion of the court with counsel for the state and for the defense. In answering that claim, the Supreme

Court held that: "[i]n the absence of a showing, on the record, that the trial court had been an active participant in negotiating the plea bargain, the trial court was entitled to reject such a conclusory allegation as warranting no further consideration. See *State* v. *Lopez*, 197 Conn. 337, 348–50, 497 A.2d 390 (1985); *State* v. *Gradzik*, 193 Conn. 35, 44–48, 475 A.2d 269 (1984); *Hartford Federal Savings & Loan Assn.* v. *Tucker*, 192 Conn. 1, 8, 469 A.2d 778 (1984)." *State* v. *Watson,* supra, 611.

We conclude, additionally, that the defendant waived any objection to the court's continuing to hear the case by participating in the various recitals of the proposed settlement and its progress. Counsel for the defendant did not voice the issue of disqualification until it became clear that his most important witness, the president of the defendant corporation, would not testify. This is the very "sandbagging" technique that the *Krattenstein* court discountenanced when it went on to state: "Although the proper course, under such circumstances, would be for the judge to decline to hear the case, '[w]hen any judge is disqualified to act in any proceeding before him, he may act if the parties thereto consent in open court.' General Statutes § 51-39. Neither the judge, nor either of the parties suggested the possibility of disqualification in this case. On the contrary, the plaintiff not only failed to raise any question as to the judge's disqualification to sit on the case but affirmatively objected to any postponement or continuance of the trial. A motion made at the commencement of the trial that the judge disqualify himself by reason of the proceedings in chambers might well have been granted, and, if it was denied, the ruling would be a proper subject of review by this court on appeal. As the case stands, not only has the claim been waived but it has also not been seasonably raised." *Krattenstein* v. *G. Fox & Co.,* supra, 615–16.

In *Timm* v. *Timm,* 195 Conn. 202, 487 A.2d 191 (1985), defense counsel did not object to settlement conferences with the trial referee and instead raised the issue for the first time on appeal. The Supreme Court found that "[t]he conduct of the defendant in this case, in failing to raise the issue of the referee's disqualification either before or during the trial, can be construed as the functional equivalent of 'consent in open court' to [the referee's] presiding over the trial. See General Statutes § 51-39 (c) . . . ." *Timm* v. *Timm,* supra, 205.

The defendant finally claims error in the referee's failure to recuse himself because he said on three occasions that the defendant's president was "playing fast and loose with the court." These comments referred to the erratic conduct of BaRoss concerning whether and when he would testify, with the result being delays and uncertainties in scheduling the case. This statement showed some agitation no doubt. Above all, it showed that a judge is a human being, not the type of unfeeling robot some would expect the judge to be. Such a passing display of exasperation, though worsened by its repetition, falls far short of a reasonable cause for disqualification for bias or prejudice under Canon 3 (C) of the Code of Judicial Conduct.[2] These statements indicate no opinion as to the untruthfulness of BaRoss, nor any prejudice or predisposition in the consideration of the evidence. Thus, the defendant's reliance on *Cameron* v. *Cameron,* 187 Conn. 163, 170, 444 A.2d 915 (1982), where the trial judge intemperately stated his belief that the defendant or his counsel was "attempt-

---

[2] Canon 3 (C) of the Code of Judicial Conduct provides in pertinent part: "C. Disqualification. (1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where: (a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding . . . ."

ing to perpetrate a fraud" upon the court and that the defendant "lied under oath" at his deposition, does not support this claim of error.

There is no error.

In this opinion the other judges concurred.